Next in 06-1273, R. H. Murphy against the Illinois Tool Works. Mr. Olkowski, you can begin when you're ready. I've reserved five minutes for review. Very well. If it pleases the Court, the appellant's principal issue with the District Court's ruling in the case is its finding that the ITW-562 and ITW-526 trays were in the prior arc to the patent suit. The District Court relied solely on the testimony of one Rod Crisp in making that finding. There was no other evidence discussed in the District Court's ruling, and there was no corroboration of Mr. Crisp's testimony as required by the law. Corroboration in this particular case was particularly necessary and important for several reasons. Crisp was not only an interested witness, he was the alleged designer of the ITW-562 tray. Was he still an employee of ITW when he testified? No, he was not. He was no longer an employee of ITW. No, but he was... That's been clear from the record. That's correct, but he was retained as ITW's paid technical expert for the case. So he was not only interested as an alleged designer of the prior art, he was biased. He was ITW's paid technical expert. The evidence showed that there were two different versions of the 562 tray in evidence. One offered by ITW had bottom capture features. That was Exhibit 222. And another tray offered by Murphy had no bottom capture features. That was Exhibit 160. So there was a real question as to which of those two trays came first. There was in addition evidence that ITW often used the same three-digit tool number for a tray, i.e. 570. That started out with no bottom capture features early on and then evolved in design as time went on with bottom capture features being added later on. And then finally, back in May of 1996, after Murphy notified ITW of its 904 patent, John O'Brien, who was then the patent counsel for ITW, asked Shannon Redding, the vice president of ITW responsible for the tray business, to find out what prior art existed at ITW that might be used to invalidate the Murphy patent. And Mr. Redding reported back in a letter, which is Exhibit 14, saying that there were no BGA trays designed or manufactured by ITW with full bottom capture features before October of 1992. So we submit that under these circumstances, evidence corroborating Mr. Crisp's testimony was critical and none was offered by ITW. The physical trays offered by ITW as prior art did not corroborate his testimony. The 562 tray that ITW offered, Exhibit 222, had a date of manufacture stamped right on it. And Mr. Crisp was asked about that stamping, confirmed that it was manufactured in November of 2001. Critical date, as we know, was back in October of 1992. The 526 tray that ITW offered, which is Exhibit 167, had no date on it. So there was no indication whatsoever from the tray itself as to its vintage. No drawings were offered. Wasn't Crisp's testimony that that tray, 526, was available in 1992? He testified to that, but again, there's nothing to corroborate that testimony. But he did testify to that point. Yes. It was available in 1992. Correct. And he also testified that the 526 tray was available and offered for sale in 19- before- You mean 562. 562.  No drawings, for example, were provided by ITW of these trays. It was routine in the design of trays to have these detailed manufacturing drawings with various revisions. What about the revision notes? I submit that Crisp's testimony, if you look at it carefully, regarding those notes, was far from clear or convincing in establishing when various features were added. Well, we've got two different issues, and let's not link them up here, it seems to me. One is whether the testimony was clear and convincing. All the evidence was clear and convincing. Two is whether Crisp's evidence cannot be considered because it wasn't corroborated. That's a matter really of admissibility, not so much a matter of sufficiency. And looking then to the latter question, why is it that the revision notes don't provide at least some corroboration for Crisp's testimony, even though, ultimately, one may say, even with the notes, Crisp plus the notes still don't constitute clear and convincing evidence? Well, we submit that the notes don't corroborate because the notes, basically, that Crisp was familiar with all post-dated the critical date. There were notes going back, but Crisp could not identify from the notes what features were being added on the various dates involved. And, in fact, he said protective walls, which really are what we're talking about, being formed on the bottom surface of these trays, looks like they were added in 1993, May, which is too late. They were taken off and then added back in. So we submit that the testimony regarding the revision notes was insufficient to constitute corroboration of Mr. Crisp's testimony, and that, therefore, his testimony should be stricken, per se. There were no drawings at all submitted of the 526 tray. I think I misunderstood what you were just saying about his testimony vis-a-vis the revision notes. You were not saying that he said the revision notes established that this feature was put in after the critical date, correct? No, I'm not saying that. I misunderstood what you were saying. If you could help me once again, what are you saying his testimony showed or did not show with respect to the significance of the revision notes? I'm saying that his testimony did not establish when various features were added to the tray design based on the revision notes, even though the revision notes had cryptic descriptions of features being added with dates associated with the revision notes and the features. Right, and I thought the inference that one would draw, possible inference based from the revision notes, is that each point at which a revision note says this feature was added as of this date would indicate that if the feature in question was not shown as being added at a later date, that you, therefore, infer that the feature was already present, and, therefore, you go back before the critical date. Why isn't that maybe not a compelling inference but a reasonable inference and, therefore, sufficient to be corroboration? Well, the reason it's not corroboration, we submit, Your Honor, is because he did not know what those features were. For example, one of the features listed in the revision was protective walls, and he did not know and could not tell on cross-examination whether the protective walls had anything to do with bottom capture features, for example. There were various other structural features added that he could not associate with the features that he said existed on the bottom of the tray prior to the critical date. So his testimony was insufficient to establish that any of those features, whatever they were, were, in fact, added to the tray, and whether those features, in fact, were features that would give the tray the capability to support BGA components on the bottom of the tray. ITW offered no invoices to corroborate. You would think, in the scheme of things, if, in fact, a tray was on sale prior to the critical date that there would have been an invoice or two that would have been produced with regard to each of the two trays in evidence. ITW offered no invoices for the 562 tray that predated the critical date. They did offer a couple of post-critical date invoices, which indicated that they were for 562 trays, but again there was nothing on the invoice itself that indicated or showed what particular version of the 562 tray was being sold. ITW did offer one invoice regarding the 526 tray, which was dated before the critical date, but again, there was no indication on the invoice as to what Rev. A of the 562 tray was. And again, we know that these trays evolved in design over time. No other witness was produced by ITW. They could have brought in another employee who could have said, yes, what Mr. Chris said about the prior status of the 562 and 526 trays was correct, but no witness was brought in. ITW chose to rely solely on Chris' testimony. We submit that that is insufficient as a matter of law to establish clear and convincing evidence of prior status. Regarding the 526 TSOP tray, Chris testified in 1998 at a fact deposition in the case before he was retained as ITW's technical expert that TSOP trays could not be used to handle BGAs. When he was confronted with this testimony at trial, he said, well, he realized after 1998, because a new BGA memory chip had come down, had been designed at that point in time that happened to be similar in dimension to a TSOP tray, he realized after 1998 that a TSOP tray could in fact be used to handle BGA components. We submit that that realization is irrelevant coming in 1998, and it's insufficient as a matter of law to show that it would have been obvious or that there would have been a motivation back at the time the Murphy invention was made to use a 526 TSOP tray and try to find a solution to the problem of supporting BGAs in both orientations. Now, 526 would still be considered prior art to the Murphy patent, would it not? The problem is we don't know what the 526, based on this record, looked like prior to the critical date. But there is testimony that did not change. 526 did not change. There is Mr. Chris' testimony that the 526, as it appeared in the physical exhibit, did not change, existed prior to the critical date. Was there any kind of corroborating evidence of the sale of that? There was a sales receipt that was submitted by ITW that was in January of 1993? For the 526, not the 562. For the 526, there was an invoice dated three days before the critical date for a Rev-A of the 526. And the question is, what was Rev-A of the 526 tray? Well, I thought the 526 was not changed. There were no changes to the 526. Well, that is according to Chris' testimony. But there was no drawing to show what Rev-A of the 526 looked like back in October of 1992. They could have submitted the drawing with the revision notes for the 526. They chose, for whatever reason, not to do that. They relied strictly on Chris saying, the 526 that I'm handing you today in court looked the same way back in October. It was the same one as the previous one. Right. And we submit that, you know, to invalidate a patent based on prior arts strictly on the testimony of one interested witness and biased witness like Mr. Chris. Under the Woodland Trust case and the Finnegan v. ITC case, it is just not, doesn't cut it under the Clarence Minting Burden Standard. Now, Mr. Okinski, you are into your rebuttal time. Would you like to say a little more? Let me just, I asked the court, I know that you've read the brief, but I asked the court to be particularly careful in reading ITW's briefs because there are many situations where statements are made without cites or cites are provided that simply don't support statements being made. And I'll just give two quick examples. On page 26 in a footnote 6, the brief states that the central extensions and corner extensions in the 3M tray, the only tray proven and admitted to be in the prior art, are in the same plane. In fact, the evidence shows that the 3M tray was a single-sided tray that had no bottom capture features at all and did not have any central extensions on its bottom surface. So, that statement is simply incorrect. On page 23 of the brief, ITW makes various statements regarding alleged features of the 526 tray as it existed back in October of 1992. But the cites, most of the cites they provide for the statements are actually exhibits relating to the 3M tray, which again was a single-sided tray with no bottom capture features. So, I would submit that the brief needs to be looked at very carefully in terms of the factual statements. Thank you. I'll save you every last minute. Thank you, Mr. Okinski. Mr. Whitmer, you have 15 minutes. Thank you, Your Honor. Let me go directly to what Mr. Okinski has been dealing with and with one of the questions that you, Judge Bryson, raised. I think there are, in fact, separate questions as to whether there needs to be corroboration, whether there is corroboration, and whether the totality of the evidence meets the clear and convincing evidence standard. I think those are all, indeed, separate questions. What we have here, however, and not to be overlooked, is we had a trial judge who had a three-week trial, who saw all the witnesses and who obtained all the evidence that he had before him. And the standard for clear and convincing evidence, which has a fairly routine phrase to it, but this Court has described it on a number of occasions, especially in the Ethicon case, that clear and convincing evidence is evidence that produces an abiding conviction that the matters sought to be established is highly probable. And that is what, in fact, the District Court found here after taking all the evidence. Can I focus on the specific items of corroboration that corroborated Crisp's otherwise uncorroborated testimony? Precisely my point was going to be that Crisp gave testimony which was corroborated in a number of ways. What's the strongest corroborative evidence? Well, let's start with 526. The 526 tray, the evidence was uncontradicted that it did not change. To suggest we had a substantial amount of discovery in this case. Who said it didn't change? Mr. Crisp said it did not change. Anybody else? No one else said it didn't change. What's the corroboration from Mr. Crisp's statement that it didn't change? I don't believe, except for the fact that he testified that it did not change, that the invoice for the 526, which is at A2065 of the appendix, that that was, in fact, an early tray. Well, that's three days. The invoice is three days before the critical date close, right? That is correct. Okay. No question about it. The point that I was going to make. Well, how do you tie the invoice for that 526, right? Yes. How do we know that was a 526 that never changed? Well, let's look at it vis-a-vis what happened with the 562. Are you giving up on the 526? Not in the least. I'm comparing them. The 562, there was evidence, because it was introduced by Murphy, that there was a different 562 tray. I believe it was Mr. Redding who testified on deposition that the numbers were used consistently, and it was an exception, in fact, that the 562, that there was more than one version of the 562. And when I say version, I don't mean changes in materials or so on. I mean a different design. So that the 562 tray, there was evidence before the district court that there was more than one kind of design of 562 tray. There was no such evidence before the district court here, and there was, after considerable discovery had been taken by R.H. Murphy, they introduced no evidence whatever to suggest it was different. There was no, the circumstantial evidence and all the other evidence in the case show that once these designs were used. But you're saying since there was evidence that there was more than one kind of 562, that proves there was only one kind of 526? No. Well, I'm missing. No. That's not what I'm saying, Judge Clevenger. What I'm saying is that the uncontradicted evidence from CRISP, to be sure, and from Redding, who was an ITW witness, is that the 526 did not change. Indeed, it was part of general testimony that said that once a number was used, that that was the design. Right, but if both of those guys, Redding and CRISP, are in-house ITW guys, then their statement's got to be corroborated, right? Redding was in-house at the time of the trial. Mr. CRISP was not. Mr. CRISP was, at the time of the trial, he was our expert. He was our retained expert. No question about it. We have the influence. You're not contending that CRISP doesn't need to be corroborated? I'm not contending that at all. Of course not. So what I'm saying is, I don't see why the 562 stuff with Redding does you any good, because he's tainted, in a Woodland Trust sense, tainted as well. I didn't take the… So let's come back to the 526. The 526… CRISP said it never changed, right? Correct. You got an invoice that's in the nice time period for you. Correct. And you're trying to say that was an unchanged 526. What I'm saying is really two things, what we argued to the district judge. And that is that we had a consistent pattern of other ITW trays that were before the court, both after the date and before the date, as to which there was only one kind of design with respect to the model number. That, indeed, the only tray as to which there was a different overall structure, I'll use that phrase, was the 562 that had the same number. With respect to the 562, we brought in a drawing, which we had. The drawing had a revision box. And Mr. CRISP's testimony, somewhat mischaracterized by Mr. Okonsky, was really to the following. The drawing, which was there, was a drawing that looked like and corresponded to the actual physical tray that the district court had before it. Why is that relevant? Why that is relevant is because what Mr. CRISP was doing in looking at the revision box, which he qualified, and we blew up the revision box. This is a 2063, right? That's the revision box, this one right here? Correct. Okay. Correct. And we blew it up because otherwise it was... We can see. He basically said, here's the 562 tray, the physical example, admittedly made after the relevant date, but looking exactly like the tray that we have on this drawing. And because in the modern age of computer-generated drawings, paper drawings aren't retained for time periods, he marched through the revision notes. Effectively to say that the revision notes told him that the tray that existed prior to October 15, 1992, the relevant date, looked in all material respects like the tray that was on the drawing, which was in evidence before the court, and which looked like the physical 562 tray that was in the court. And it was that physical 562 tray. But his testimony was not that clear. I mean, as far as going from that to F, he was fine, but when he went back to E and D, he was not quite sure, was he? Well, what I... The revision he says added cross ribs and coring. He asked specifically what was done in connection. I don't know exactly which ribs were added and which ribs were cored. But... I mean, that's not very clear. Well, I think... Convincing testimony. Well, I think, Your Honor, what it is, what it is, is that Mr. Crisp was able to say, as a result of looking at what the revision notes were, that the revision notes did not indicate in any way that it was substantially different from what was drawn or what was physically in the courtroom. And one of the points I wanted to make, which I think I've lost in one of my answers, was that the 562 and the 526 really have the same structures. And we're not looking to... we need both of them to add them somehow together to support the district court's overall conclusion. You say for purposes of the obviousness analysis, they're essentially the same device. They have the same structure. And the 562 is just somewhat of a larger tray. It has features that are somewhat larger to see, so from an advocate's point of view, it's a little nicer to show that because otherwise you have to get down a little closer. But structurally, the 562 and the 526 are the same. And as we say, it's not surprising since they follow on to one another. So that what Judge Stearns had in front of him was the testimony of Crisp, which he had the drawings of the 562, he had the invoice of the 526. And this court has held on a couple of occasions that circumstantial evidence, in looking at the totality of the circumstantial evidence, can lead to corroboration. Crisp was found by Judge Stearns to be an entirely credible witness. Indeed, in one of the footnotes, he cites Mr. Crisp's testimony in support of the conclusion that favors Murphy. And then Mr. Crisp's testimony, with respect to being found credible, obviously the purpose of corroboration is not in the abstract. It's not just a requirement that's been put out for no reason at all. It's in order to say, if you're going to try to prevent after-the-fact or litigation-inspired testimony, you have to have some reason to believe that it's true. Well, the district court, I think, canvassed the evidence that he had, had the witnesses in front of him, and came to the conclusion that, in fact, all the evidence, all the testimony that was given to him, all the physical evidence that he had, led him to conclude that Crisp's testimony could be credited, that the corroboration was sufficient for purposes of crediting that, and that, therefore, in point of fact, the features of the 904 patent, as described during the litigation, were simply simple rearrangements of the features found on the 526 and the 562. Or put another way, as I think the district court approached this, that to the extent that one could say that the accused trays fall within the scope of the patent as asserted by the plaintiff here, so did the 562 and the 526. That either, as he says, as the district court says in the context of the inter-engagement definition, either the ITW trays inter-engage or they don't. And that using the definition that was used by Murphy, he finds that both the 526 and 562, as well as the accused trays, fit that definition. Now, coming back to where we were, I guess, about 10 minutes ago on beginning to go down the line of looking at corroboration, just to make sure we haven't left any stones unturned here, we've mentioned the physical exhibits. Correct. Albeit later iterations, or at least we don't have absolute proof that particular items were manufactured before 92. We've never asserted that the 526 was before it has been proved. Okay, understood. And we have the revision notes, and this is setting aside for the moment Crisp's testimony, and then we have the invoices, which identify. And then, just to make sure I understand, your position with respect to the evidence that there were different designs attached to the same number is that that was limited just to the five, gosh. Sixty-two. Sixty-two. I'm sorry. They're the same number. The numbers have confused people. It's dyslexic's nightmare, right? Yes, it is. So, now, is there anything else out there that we haven't canvassed? Well, I would suggest to you that the drawings at 2890 and 2898, 2890 and 2891, which are Mr. Crisp's own drawings, contemporaneous drawings. They're clearly his drawings, but they're drawings that were done by him at an early time period, which show the stackable tray. Add to the overall credibility and the assertion that the evidence is of such a magnitude that it creates the abiding conviction that the matter sought to be proven is highly probable. Those two sketches at 2890 and 2891. We have the revision G at 2064. The invoices are 2065 through 2067, and I think the revision box, the drawing is at 2062 and magnified at 2063, if my notes are correct. All right. I would otherwise say that corroboration, in terms of the circumstantial evidence, that Mr. Crisp was credited by the judge as being a credible witness and having been a designer, so that the idea that one would go back when you, as we know, these trays are not manufactured in the abstract. I think I'll build a tray and see if I can find somebody who makes a chip that fits it. Chip manufacturers go out and solicit people to make trays. When one is encouraged to build a tray for a new chip, you go back and look at old designs and see what it is you've got to modify or such elements as you would use. As I said, the district court here, I think canvassed the record appropriately, found an appropriate amount of corroboration. And credited Crisp's testimony and found, I think appropriately, that the asserted claims of the 904 patent were invalid. We pressed other reasons in our brief. I have a brief on those points. With that, I will sit down. Thank you, Mr. Whitner and Mr. Okinski. You have a little bit of rebuttal time left. With all due respect to my brother, Mr. Whitmer, his answer to your question was flat wrong. Which question? The question with regard to the 562 being the only tray as to which the evidence showed there were different designs. First of all, I asked Crisp on cross-examination whether it was not an uncommon practice at ITW to use the same tool number for a tray, even though new features are added to the tray after the introduction of the original tray. This is on the bottom of page 36 of our principal brief, and he answered, that is true. That is true. The next paragraph on page 37 of our brief shows that ITW did this same thing with respect to a so-called 570 tray. It started out as a single-sided tray with no bottom capture features at all. There was an intermediate design later on, and then sometime in 1994, after ITW became aware of Murphy's design, ITW issued a change order. Adding the dead bug features to the bottom of the 570 tray. So that tray evolved over time, and it was not an uncommon practice at ITW to do it. Mr. Whitmer suggests in his argument that the courts looked at corroborating evidence. The court was totally silent about any corroborating evidence. In the Finnegan v. ITC case, the court stated, this court, that Jeffords, the key witness in that case, was a credible witness. And Chris, according to Judge Stern's analysis, was credible. You objected on the grounds that the evidence was not corroborating? Oh, definitely. During trial? Oh, yes. Yes, we did, throughout the trial. We, in fact, briefed the need for corroborating evidence throughout the trial. Well, if you did, and if the judge found the evidence to be admissible, as he clearly did, it would seem that the judge likely regarded there being sufficient corroboration. That's the inference that you would normally draw from the judge's conclusion that evidence objected to is nonetheless admitted. Well, the evidence was presented. At the close of trial, we submitted proposed findings. Well, when you objected to Judge Stern's on the ground that Chris wasn't corroborated, I assume the other side made the argument that they've made here today. They said, oh, yes, it was corroborated by revision notes, by et cetera, et cetera. We really did not specifically object. The way it progressed is— Well, what's the difference in objecting and not specifically objecting? Because the objections were in the context of the proposed findings of fact and conclusions of law that were submitted. This was a bench trial, and the procedure was we ended the case. Arguments were submitted, and during the closing arguments, we said that the court cannot rely solely on Chris' testimony. Can we just walk through it for a second? So when Chris was done with his testimony, you didn't move to strike the testimony? No. No. We argued at the close of the case that the testimony should not be believed because it wasn't corroborated, that it didn't meet the clear and convincing standards. And presumably—go ahead. Yeah. And did the other side counter that, so the judge had two points of view presented to him? I don't really recall what ITW's response to that, but I would presume yes. I don't know if we put the closing argument transcripts in. I mean, in all likelihood, the judge had presented to him what we've heard here today. In all likelihood, although, you know, it's been pulled together in a more concise— It wasn't, as you say, it wasn't teed up in a motion to strike or a motion in limine or anything like that. So it comes sort of at the end, and you're saying, hey, judge, you can't rely on this because it's not corroborated. They say, oh, yes, it is, by the revision notes and this and that and the other thing. And then the judge writes a decision in which he credits the testimony. Credits the testimony but doesn't talk at all about any corroboration. There has to be an inference unless the judge—I mean, there isn't an inference that judges are asleep. No, but the inference is that he relied strictly on Chris' testimony. I don't know that that's a fair inference. I mean, there are a lot of objections that come up at different times in the course of the trial, some of which make their way to courts of appeals, in which the judge just overrules the objections without giving a speaking explanation of why or without putting it in a Jamal opinion. But that doesn't mean that we have to reverse on the grounds that there wasn't an explanation as long as the evidence is sufficient to support the ruling. Well, we would submit it. You think it's not. I understand that. But the separate question of whether the judge somehow committed reversible error for not adverting to the grounds for admitting the evidence in the course of this opinion seems to me a questionable proposition. Well, there's no question that in our closing arguments and in our post-trial findings of fact and conclusions of law, we articulated the proposition that the testimony was not corroborated. And there's no question that the judge did not talk about corroboration in his ruling. But I understand where you're coming from. Well, I think that's so. We do have one more question. With respect to what was said by Mr. Whitmer, is it true that 526 and 562 are just different size trades? No, they're trades designed for totally different parts. The 562 is designed for a so-called flawed flat pack part, which has typically a square body. Terminals coming out on each of its edges. But they're different. They're different. 526 was a TSOP part, which is an elongated smaller part with terminals coming out only on two sides. So there are very different design considerations that go into the design. So keep in mind also, the 526, Mr. Chris' testimony about it before he was retained as an expert, that it couldn't be used to hold BGAs. And I think that undercuts any obviousness findings based on the 526. Thank you. Thank you. Both counselors. The case is submitted. Honorable Court of Appearance from day to day.